**Jester CLABON, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 01–02–00398–CR.**

Court of Appeals of Texas,
Houston (1st Dist.).

July 17, 2003.

Larry P. Urquhart, Moorman, Tate, Moorman, Urquhart & Haley, Brenham, TX, for Appellant.

Frederick A. Edwards, Assistant Criminal District Attorney, Michael J. West, Debra S. Mergel, Assistant District Attorneys, Sherry L. Robinson, Criminal District Attorney, Hempstead, TX, for Appellee.

Panel consists of Chief Justice RADACK and Justices ALCALA and HIGLEY.

## OPINION

LAURA CARTER HIGLEY, Justice.

A jury found appellant, Jester Clabon, guilty of capital murder. The State did not seek the death penalty, and punishment was assessed at confinement for life in prison. We affirm.

### Background

Appellant was tried for the April 2000 murders of his girlfriend, Laura Stiles, and her landlord, Frank Smith. On the night of the murders, appellant and Stiles, along with several other people, were using narcotics in appellant's sister's home in Brookshire. Appellant's sister's house is directly behind the house in which Stiles and Smith lived. Sometime after 2:00 a.m., appellant's sister, Sarah Clabon, returned home and found appellant and the others in her house. Sarah demanded that they leave her house. Before driving away, two of the men present, Dan Mask and Joe Thibodeaux, told Stiles that they would meet her later at her home. As they drove away, Mask saw appellant standing behind Sarah's house, near the house in which Stiles and Smith lived.

After everyone left, Sarah and her boyfriend retired to her bedroom. Appellant and Thibodeaux returned to Sarah's home shortly thereafter. Once she saw who was on her doorstep, Sarah shut the door before appellant and Thibodeaux could enter, and, assuming they had come to buy drugs, she told them that "the shop was closed." Later, appellant returned by himself. This time, instead of knocking on the door, appellant knocked on Sarah's bedroom window-unit air conditioner. Sarah opened the front door and saw appellant, without his shirt on, apparently very frightened. Appellant told Sarah that he had killed Stiles and Smith. Sarah saw a bloody knife in appellant's hand that had

something on it, which Sarah believed to be flesh. Sarah also saw that appellant's hands had a small amount of blood on them. While in Sarah's home, appellant told Sarah's boyfriend, Jason Robertson, that he thought he had killed Stiles and Smith, but that he didn't "know if they was back there dead or not." Appellant asked for money from Sarah and Robertson, claiming that he had to "get away." Appellant took the keys to his parents' Suburban from Sarah's kitchen and left Sarah's house.

Meanwhile, Mask and Thibodeaux had returned to the house Stiles and Smith shared in order to meet Stiles as agreed. Mask noticed that the house's storm door appeared to have been kicked in. When Mask and Thibodeaux investigated, they found both Stiles and Smith dead inside the house. Mask and Thibodeaux left the house, encountering Sarah. Sarah inquired whether Stiles and Smith were dead, and Mask and Thibodeaux told her that they believed they were. Mask, Thibodeaux and Sarah went to Sarah's house and, after a period of time, Mask walked out to the main road to hail a nearby police car and notify officers of the deaths.

Appellant drove his parents' Suburban to Houston. After briefly stopping at the home of another of his sisters, Angalar Whitfield, appellant drove farther into Houston. Once inside the City of Houston, appellant arranged to sell his parents' Suburban to Roginal Crouch for $300. Crouch had never seen appellant before purchasing the Suburban from him. Crouch drove the Suburban only once between the time he purchased it from appellant and the time the police recovered it. Investigators found traces of blood on the inside and outside of the driver's-side door of the Suburban.

During appellant's trial for the murders of Stiles and Smith, several police officers testified about an interview they had conducted with Angalar Whitfield during their initial investigation. Chief Joseph Prejan of the Brookshire Police Department and Texas Ranger Jessie Mack testified that they interviewed Whitfield shortly after the murders occurred. Prejan testified that, when she gave her statement to police about appellant's visit to her home, Whitfield made a motion with her hands. Over appellant's objection, during his testimony, Prejan mimicked for the jury the stabbing motion that Whitfield had made that day—moving her closed fist into her left breast and left arm. Prejan also testified that the hand motions were "of significance" to him in the investigation, although he did not elaborate upon their significance. Ranger Mack, in his testimony, also mimicked the motions Whitfield had demonstrated for police. Appellant renewed his objection at Mack's demonstration. Further, in his testimony, Mack explained that the motions he saw Whitfield make during the interview were significant because the part of her body that Whitfield had indicated with the hand motions in her statement were the exact areas of the body in which Laura Stiles had been stabbed. Ranger Mack further testified that, at the time appellant visited Whitfield the day after the murders, no one except the murderer could have known exactly where Stiles' wounds were located.

Waller County Sheriff's Deputy Toby Haas also testified that, several months after the murders of Stiles and Smith, appellant was incarcerated in Waller County. Jail personnel called Haas in to assist in recovering a pen appellant had stolen. Over appellant's objections, Haas testified that, while searching appellant, he found a "shank," a homemade weapon, concealed in the waistband of appellant's boxer shorts. Haas then took appellant back to another cell after the search. On

the way to the cell, appellant looked in Haas's direction and stated, "I know who is going to be the third." At trial, Haas testified that he interpreted the statement as a threat by appellant to kill him. At the end of Haas's testimony, the trial court instructed the jury that they were not to consider extraneous offenses unless they found beyond a reasonable doubt that appellant committed the offenses and, even then, they were only to consider the offenses in determining the intent, motive or identity of appellant in connection with the murders of Stiles and Smith.

The jury found appellant guilty of capital murder, and the trial court assessed punishment at confinement for life.

### *Hearsay*

In his first and second points of error, appellant contends the trial court erred when it admitted testimony regarding the hand motions Whitfield made when she gave her statement to Chief Prejan and Ranger Mack.

An appellate court reviewing a trial court's ruling on the admissibility of evidence must utilize an abuse-of-discretion standard of review. *Weatherred v. State*, 15 S.W.3d 540, 542 (Tex.Crim.App.2000). The appellate court must uphold the trial court's ruling if it was within the zone of reasonable disagreement. *Id.*

Hearsay is defined as a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted. TEX.R. EVID. 801(a). A "statement" is (1) an oral or written verbal expression or (2) nonverbal conduct of a person, *if it is intended by the person as a substitute for verbal expression. Id.* (emphasis added). Appellant contends that the trial court erred by admitting testimony about Whitfield's hand motions because the motions were intended as a substitute

for a verbal statement that she had knowledge, relayed to her by appellant, of the location of the victims' wounds.

Non-verbal actions may be hearsay if they are "assertions by conduct." *Graham v. State*, 643 S.W.2d 920, 926–27 (Tex.Crim.App.1981). In *Graham*, the Texas Court of Criminal Appeals held that a shooting motion made by a victim when the police showed her a photograph of her attacker was hearsay because it was "assertive in nature." *Id.* at 927. The court held that, because "testimony concerning [the victim's] actions and conduct was only significant as indicating her belief that appellant was the individual who had shot her," that testimony was inadmissible hearsay. *Id.* Likewise, the descriptions of Whitfield's hand motions given by Police Chief Prejan and Ranger Mack were given in order to indicate that appellant had admitted knowing information about the murders of Stiles and Smith to Whitfield. Accordingly, the testimony given by Prejan and Mack regarding Whitfield's hand motions was hearsay, and the trial court erred by admitting the testimony. Furthermore, we conclude that the trial court's decision to admit testimony about Whitfield's hand motions was not within the "zone of reasonable disagreement." *Weatherred*, 15 S.W.3d at 542.

Error in the admission of evidence is subject to a harm analysis under Rule 44.2(b) of the Rules of Appellate Procedure. *See Johnson v. State*, 967 S.W.2d 410, 417 (Tex.Crim.App.1998). A violation of the evidentiary rules that results in the erroneous admission of evidence is nonconstitutional error. *See King v. State*, 953 S.W.2d 266, 271 (Tex.Crim.App.1997). Any nonconstitutional error "that does not affect substantial rights must be disregarded." TEX.R.APP. P. 44.2(b). A substantial right is affected when the error

had a substantial and injurious effect or influence in determining the jury's verdict. *See King,* 953 S.W.2d at 271. A criminal conviction should not be overturned for nonconstitutional error if the appellate court, after examining the record as a whole, has fair assurance that the error did not influence the jury, or had but slight effect. *See Johnson,* 967 S.W.2d at 417. In making this determination, we consider the trial court's erroneous admission of the extraneous offense in the context of the entire record and not just whether there was sufficient or overwhelming evidence of the defendant's guilt. *Motilla v. State,* 78 S.W.3d 352, 355–56 (Tex.Crim.App.2002).

Here, the testimony regarding Whitfield's demonstration for police officers was little more than an assertion by the officers that Whitfield had made a stabbing motion while describing appellant's visit after the murders. Further, the jury heard other evidence regarding appellant's knowledge of the manner in which Stiles and Smith were killed, including his confession to his other sister, Sarah Clabon, and her boyfriend. The jury also heard Sarah's testimony that appellant had blood on his hand during his confession in her home, testimony regarding appellant's possession of a bloody knife, appellant's flight in his parents' Suburban, and the presence of blood inside that Suburban. When compared to other evidence presented to the jury, we believe that the testimony regarding Whitfield's hand motions had little influence, if any, in determining the jury's verdict. Accordingly, the admission of Whitfield's demonstration to police officers, while error, was not harmful error. We overrule appellant's first and second points of error.

### Extraneous Offenses

■ In his third and fourth points of error, appellant contends that the trial court erred when it admitted testimony regarding a shank found on appellant while he was incarcerated. Appellant first contends that his possession of the shank, as an extraneous offense, was irrelevant and inadmissible under Rules 401 and 404(b). Additionally, appellant contends that the extraneous offense evidence of his possession of the shank was inadmissible under Rule 403 because its probative value was substantially outweighed by the danger of unfair prejudice.

Rule 401 defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tex.R. Evid. 401. Rule 404(b) provides, in part, as follows: "Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Tex.R. Evid. 404(b). It may also be proper to admit evidence of extraneous offenses in order to prove the context in which an offense occurred. *Castaldo v. State,* 78 S.W.3d 345, 350 (Tex.Crim.App.2002).

Rule 404(b) embodies the established principle that a defendant is not to be tried for collateral crimes or for generally being a criminal. *Nobles v. State,* 843 S.W.2d 503, 514 (Tex.Crim.App.1992). Therefore, an extraneous offense must be shown to be relevant apart from character conformity before it may be admitted into evidence. *Alba v. State,* 905 S.W.2d 581, 585 (Tex. Crim.App.1995).

It is the trial court's task to determine whether extraneous offense evidence is relevant to a purpose other than the propensity of the defendant to commit crimes or other bad acts. *Ransom v. State,* 920 S.W.2d 288, 300 (Tex.Crim.App.1994).

The trial court's ruling is entitled to deference and will be reversed only for abuse of discretion. *Id.*

Appellant contends that the trial court erred when it admitted evidence of his possessing a shank because the offense was not relevant to any questions regarding "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident" arising in his trial. The State contends that evidence of the appellant's possession of the homemade shank (1) was relevant to show appellant's identity, motive and intent in the murders of Stiles and Smith, (2) is intrinsically linked to other unobjected-to evidence of appellant's extraneous threat to Deputy Haas regarding "who is going to be the third," and (3) was rebuttal of the defense's claim that appellant was not the person who committed the murders.

Appellant concedes that the statement about who would be "the third" may have been relevant in this case, but he argues that the trial court erred when it admitted evidence regarding the earlier discovery of the shank on appellant's person at the jail. Appellant, however, made the threat to Deputy Haas after the deputy discovered the shank. The threat that appellant "knew who is going to be the third" cannot be understood without linking the threat to the evidence of the shank. Thus, once the court determined that the threat was admissible, the shank evidence was also admissible because it was necessary to show the context in which the threat occurred.

Our inquiry does not end here. When evidence of misconduct outside of the charged offense is offered under one of the exceptions to the Rule 404 prohibition against admission of extraneous offenses, there is a danger that the jury will misuse the evidence to infer character. *Castaldo,* 78 S.W.3d at 350. Hence, we must determine whether the danger of undue prejudice outweighs the probative value of the evidence. In making this determination, the Court of Criminal Appeals has suggested that at least the following four factors be considered: (1) the inherent probative value of the evidence; (2) the potential that the extraneous offense will impress the jury in some irrational but indelible way; (3) the amount of trial time that the proponent uses to develop evidence of the extraneous offense; and (4) the proponent's need for the extraneous offense. *Montgomery v. State,* 810 S.W.2d 372, 389–90 (Tex.Crim.App.1990). The trial court's ruling must be upheld so long as it was "within the zone of reasonable disagreement." *Id.* at 391.

▮ We have already held that the evidence of the shank was necessary to show the context of appellant's threat to Deputy Haas. As for the potential to irrationally impress the jury, it is true that an similar offense always carries the potential to impress the jury. Nonetheless, here, the impermissible inference of character conformity was minimized by the trial court through a limiting instruction to the jury. It appears from the record that little trial time was used eliciting evidence of the offense. Finally, not only was the evidence of the shank necessary to explain the threat, but it also could have been necessary to prove identity, which was contested at trial, and to rebut the defensive theory that someone else committed the murders. The court's admission of the evidence of appellant's possession of the shank was well within the "zone of reasonable disagreement." We overrule appellant's third and fourth points of error.

### Conclusion

We affirm the judgment of the trial court.